Docket No. 98609.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
MICHAEL RIVERA, Appellant.

*Opinion filed May 18, 2006.–Modified upon denial of
rehearing June 29, 2006.*

JUSTICE KARMEIER delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Freeman, McMorrow,
Fitzgerald, Kilbride, and Garman concurred in the judgment
and opinion.

**OPINION**

The defendant, Michael Rivera, was charged in the circuit court of Cook County with two counts of first degree murder. Following a jury trial, the defendant was found guilty and was subsequently sentenced to 85 years' incarceration in the Illinois Department of Corrections. Defendant appealed, arguing that (1) the trial court erred when it *sua sponte* raised a reverse-*Batson* (see *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)) challenge to his use of a peremptory challenge during jury selection, (2) the procedure resulting in the imposition of his extended-term sentence violated the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and (3) the procedure resulting in the imposition of his extended-term sentence violated his right to a jury trial as guaranteed by the Illinois Constitution. A divided appellate panel rejected those contentions and affirmed defendant's conviction and sentence. 348 Ill. App. 3d 168. We granted the plaintiff's petition for leave to appeal. 177 Ill. 2d R. 315.

On appeal, defendant advances multiple arguments, all of which are merely facets of the same *Batson* and *Apprendi* arguments defendant raised below. Specifically, defendant submits that (1) trial judges do not have third-party standing to raise *Batson* challenges *sua sponte*; (2) the trial court's *sua sponte Batson* challenge to defense counsel's peremptory strike of juror Deloris Gomez was incompatible with the three-step *Batson* process; (3) the trial court erred in proceeding to the second step of the *Batson* process where no inference of a *prima facie* case of discrimination had been established; (4) the trial judge erred in his ultimate determination that defense counsel discriminated against juror Gomez; (5) the trial court's improper denial of defense counsel's peremptory strike of juror Gomez was reversible error; (6) the trial court's "violation of state statutory and constitutional guarantees to jury trial" are not amenable to harmless-error review; (7) *Apprendi* violations are not subject to harmless-error review; and (8) *Apprendi* violations in this case are not harmless beyond a reasonable doubt. Defendant's individual contentions will be addressed, as warranted, in the context of the broader *Batson* and *Apprendi*

issues he has raised. We will set forth only those facts pertinent to the issues defendant has raised.

## BACKGROUND

During jury selection, defense counsel questioned juror Deloris Gomez, a business office supervisor at Cook County Hospital's out-patient orthopedic clinic. In the course of that questioning, Gomez acknowledged that Cook County Hospital is known for the treatment of gunshot victims and, as a part of her employment at the clinic, she has contact with patients, "checking them in." Gomez said her interaction with the victims of violent crime would not affect her ability to serve as a juror in the case. Following *voir dire*, and apparently in the presence of Gomez and other prospective jurors, defense counsel announced his intention to use his fourth peremptory challenge against Gomez, as the following excerpt from the transcript indicates:

> "MR. DECKER [Defense attorney]: Your Honor, with thanks, we would ask to excuse Mrs. Gomez.
>
> THE COURT: I'm going to ask you to remain, Mrs. Gomez. I'm going to ask counsel to join me, if the court reporter will join me, and the defendant will join me in chambers. Excuse me, ladies and gentlemen."

In chambers, the court directed defense counsel to "kindly articulate a basis of why you are excusing Ms. Gomez." Defense counsel protested, "The court has done it on its own motion *sua sponte*." The trial court responded: "I will do it. It is the citizen's right to sit as a juror, and I will implicate myself *sua sponte* if I feel somebody's rights are being impinged upon ***." Defense counsel then complied with the court's directive, responding:

> "Mrs. Gomez has a connection to a hospital that on a daily basis probably sees more gunshot victims than any other hospital in the world ***. Given that fact that she's in the orthopedic section, I think on a daily basis even though she's a supervisor, even though she's not a rehabilitative nurse, she on a daily basis sees those victims who are victims of violent crime. For those

˘3˘

reasons it constrains me. I know she has some kind of Hispanic connection given her name. I'm pulled in two different ways. For those reasons I asked that the –."

At that point in defense counsel's explanation, the trial court interrupted counsel, noting that "Mrs. Deloris Gomez appears to be an African-American." The court then asked to "hear from" the State on the issue, the prosecutor having been totally silent and uninvolved to that juncture. After some initial observations regarding the theory of the case and the issue for the jury's consideration, the prosecutor echoed the court's sentiment that the offered cause for excusing Gomez was insufficient. Defense counsel then noted that he had previously accepted an African-American woman to sit on the jury, and the court quickly pointed out that Gomez was the second African-American woman that the defense had sought to exclude. The court stated it was the articulated reason given for the peremptory challenge of Gomez that was of particular concern. The court concluded:

"I've heard her answers to the questions. I've looked at her jury information form, and I'm quite frankly very much concerned, Counsel, as to why Mrs. Deloris is being excused–Mrs. Deloris Gomez is being excused. She works in a clinical division of this hospital. It may have a reputation of having many emergency cases, I presume, involving gunshot cases, but again she works in a business office, the very first line identifying her job.

\* \* \*

I did this *sua sponte* because I was concerned about the right of Mrs. Gomez to be a juror and participate. If the State in fact had done this, I certainly would have found they would have established a *prima facie* case by the very reason–what I'm going to do is allow Ms. Gomez–allow her to be seated, not excuse her on the basis of your peremptory.

I feel under these circumstances the reasons given by you, Mr. Decker, do not satisfy this Court. As far as I'm concerned, it's more than a *prima facie* case of discrimination against Mrs. Gomez. I'm not going to

˅4˅

allow her to be excused. She will be seated as a juror over objection."

Defense counsel then asked for, and was granted, leave to conduct further questioning of Gomez, and noted defendant's objection of record. Further questioning of Gomez was conducted by defense counsel in chambers. Gomez again acknowledged the "great number of patients" who are seen in Cook County Hospital's emergency room "as a result of violent crimes"; however, Gomez pointed out that the clinic where she works is a separate building. Defense counsel's questioning of Gomez continued:

"MR. DECKER: But the individuals that are seen there at Fantus Clinic, I know they are not seen in the emergency room on an emergency room basis; you don't have the facilities there. It's mainly appointments that people are awaiting and people picking up medications. I believe there is a pharmacy also, I believe, there on the first floor?

JUROR GOMEZ: Yes, it is.

MR. DECKER: Certainly some of those victims are–certainly some of those patients were victims of gun violence?

JUROR GOMEZ: Yes, they were.

MR. DECKER: Does that fact set you off against my client as opposed to if he was charged with something else, you know, suppose if he was a defendant charged with theft or possessing a stolen motor vehicle, that's our concern?

JUROR GOMEZ: No, it does not. It does not affect me in that way.

MR. DECKER: Do you still feel you'd be able to fairly view the evidence and follow the instructions and the law that his Honor, Judge Fiala, will be giving you?

JUROR GOMEZ: Yes, I do."

With the conclusion of counsel's questioning, the trial court directed Gomez to resume her seat in the jury box. Subsequently, out of juror Gomez's presence, the trial court

inquired of defense counsel whether counsel wished to say anything further. Counsel responded:

> "Yes, your Honor. My feeling [*sic*] are still the same. I feel that I'm trying to modify the composition of this panel. I'm not trying to exclude a woman because of her race, but–strike that–not trying to excuse a juror because of her race. But also I think I can also factor in the fact that she would now be out of the–by the fact that the jury is predominantly women, I'm trying to get some impact from possibly other men in the case. I just don't feel that under these circumstances my client should be precluded from his reason to exercise a peremptory challenge."

Defense counsel asked the trial judge if he had ever been to Fantus Clinic, and the court advised counsel that the court could not comment on that. Defense counsel then told the court: "It's wall to wall victims and patients coming in there, and I could see it's a disturbing place for me to be there when I've been there."

The court concluded:

> "I had the opportunity to question Deloris Gomez who I find is a very intelligent lady. I considered her statements very carefully, her testimony very carefully, and I again feel that she shall sit as a juror. I shall not excuse her, and I will override your peremptory challenge as to Ms. Gomez, and I find no basis for cause. So Mrs. Gomez shall sit as a juror."

In view of the court's ruling as to Gomez, defense counsel asked to excuse "as [defendant's] fourth peremptory[,] Mr. Kurich." Inexplicably, the court responded as to *that* peremptory challenge, "With reluctance I will allow it."

When the evidentiary portion of defendant's trial commenced, the State presented evidence establishing that defendant shot and killed 16-year-old Marcus Lee, erroneously believing that Lee was a member of a rival gang. Defendant does not challenge the sufficiency of the evidence supporting his murder conviction, and he raises, as additional error, only

an *Apprendi* issue; therefore, we set forth only the trial evidence pertinent to that issue.

At trial, the State called Susan Shelton, Miguel Rodriquez, and Charles Oberlin to testify regarding the events of January 10, 1998, the night of the murder. All three witnesses were former members of defendant's gang, the Insane Deuces.

Susan Shelton testified that she was with the defendant on the night of the murder. That evening, Shelton attended a party where defendant and several other members of the Insane Deuces were also in attendance. At some point in the evening, defendant, Shelton, Carlos Sanchez (also a gang member), and three others left the party in Sanchez's van, with Sanchez driving. While they were driving around defendant saw two persons walking down the street. Defendant identified those individuals as members of a rival gang. Defendant directed Sanchez to stop the van. Defendant then produced a gun and exited the van, but returned a few seconds later, instructing Sanchez to chase the two persons they had just seen. Shelton testified that they never saw those two individuals again that night, but defendant later noticed another individual on the street, and announced, "There go [*sic*] that pussy ass Stone from earlier." Shelton knew that the Insane Deuces and the Stones were rival gangs.

Defendant pointed his gun at Sanchez and ordered him to "stop the fucking van." When the van stopped, defendant exited the van, still holding the gun. Two other occupants followed. Defendant ran around the side of the van, and out of Shelton's sight. Shelton then heard gunshots. Defendant and the others returned to the van, with defendant still holding the gun. The two other individuals with defendant were yelling gang slogans until defendant told them to "shut the fuck up," advising them that he still had "one bullet left." Defendant was the only person Shelton saw armed with a weapon that evening. After the shooting, defendant continued to direct the van's movements. At one point, defendant ordered the van to stop in an alley. Defendant unloaded the gun and handed the shell casings to Shelton. Defendant got out of the van with the gun and later returned without it. Shelton gave the shell casings to Sanchez, and he apparently disposed of them.

Sanchez then took defendant and three other individuals back to the party. Shelton testified that she believed defendant to be the "chief enforcer" of the Insane Deuces, a gang position below the chief, or "jefa," and above the foot soldiers.

Miguel Rodriguez testified that he was a member of the Insane Deuces on January 9, 1998, and several members of the gang–including defendant–were at his home that evening. Between 8:30 and 9 p.m. that day, the group was notified that there were some "Stones" in a park near Rodriguez's home. The group, including defendant and a person named "Nelson," went to the park, where they saw some individuals playing basketball. Defendant began to "throw" gang signs, indicating his allegiance to the gang. When those playing basketball did not respond, the group returned to Rodriguez's home.

Back at Rodriguez's home, defendant referred to the individuals in the park as "pussies" because they were afraid to fight. Later that night, Rodriguez observed defendant in possession of two chrome revolvers. Thereafter, defendant began asking other gang members if they wanted to go with him to the projects. Defendant and other members of the gang left Rodriguez's home between 12:30 and 1 a.m. When Rodriguez next saw defendant it was approximately 3 a.m. At that time, defendant announced to Rodriguez that he was a "Stone killer," and he indicated he had shot someone that evening. Rodriguez identified Nelson as a "chief" of the gang, and defendant as the "chief enforcer." He explained that the role of the chief enforcer was to enforce the chief's decisions.

Charles Oberlin testified that he was a member of the Insane Deuces in January of 1998, and he knew defendant as the "chief enforcer" of that gang. Around 3 or 4 a.m. on January 10, 1998, Oberlin saw defendant in possession of a chrome gun, and defendant indicated that he had fired the weapon. Oberlin described his own position in the gang hierarchy at the time as that of an "old-G," or elder. Oberlin explained that his position was above that of "foot soldiers," but below the chief enforcers, the chief and the vice-president.

During closing argument, the prosecutor argued that defendant was the "chief enforcer" of the Insane Deuces and killed Marcus Lee because he thought Lee was "a Stone." The

jury found defendant guilty of first degree murder. Juror Gomez served as the foreperson of the jury.

At a subsequent hearing, the circuit court denied defendant's posttrial motion and proceeded to sentencing. The State argued that an extended-term sentence was warranted because the murder was committed in a brutal and heinous manner indicative of wanton cruelty (see 730 ILCS 5/5–5–3.2(b)(2) (West 2000)) and defendant was a leader in the Insane Deuces street gang and the murder was related to the gang's activities (see 730 ILCS 5/5–5–3.2(b)(8) (West 2000)). Defense counsel argued that the murder was not committed in a brutal and heinous manner and, though all the witnesses referred to defendant as the "chief enforcer" of the gang, "it was not clearly shown that defendant was a leader, motivator or supervisor" of the gang. The circuit court determined that an extended-term sentence was warranted, stating:

> "I further find that [defendant] was indeed a chief enforcer of the Insane Deuces gang, *** and a weapon was obtained at his direction and a search for rival gang members was then had."

Continuing, the court concluded, "It was a senseless, brutal killing and I feel that under the circumstances this was a gang incident, gang motivated at the direction of this defendant." The circuit court apparently accepted the State's contention–now discredited– that the principles of *Apprendi* do not apply because the sentencing range for first degree murder is "twenty to death by lethal injection." See *People v. Swift*, 202 Ill. 2d 378, 392 (2002) (sentencing range for first degree murder in Illinois is 20 to 60 years' imprisonment). The circuit court sentenced defendant to an extended-term sentence of 85 years in the Illinois Department of Corrections.

Thereafter, defendant filed a motion to reconsider sentence. At the hearing on that motion, defense counsel argued that *Apprendi* requires *a jury* to find the factors enabling the imposition of an extended-term sentence. Counsel also argued that defendant was not in a leadership position within the gang, as required by the statute, because his place in the gang hierarchy places him below "the chief" and required him to

carry out the chief's orders. The circuit court persisted in its prior ruling and denied the motion for reconsideration. Defendant appealed.

A divided appellate panel affirmed the judgment of the circuit court. The court was united in holding that a "trial court has standing to act on behalf of a juror subject to discriminatory jury selection practices." 348 Ill. App. 3d at 176. The appellate court cautioned that the trial court has a *right* to raise *Batson* objections *sua sponte*, but it has no corresponding *duty* to do so. 348 Ill. App. 3d at 176.

Relying upon this court's opinion in *People v. Hudson*, 157 Ill. 2d 401 (1993), the appellate majority found it unnecessary to "consider whether combined race-gender discrimination can be used to establish a *prima facie* case under *Batson*." 348 Ill. App. 3d at 177. The majority cited this court's opinion in *Hudson* for the general proposition that "once the trial court rules on the ultimate question of discrimination the question of whether a *prima facie* case had been established is moot," and thus the majority rejected the dissent's argument that the "matter should be remanded for a hearing on whether a *prima facie* case existed." 348 Ill. App. 3d at 177. The appellate majority observed, "because the trial court's determination [on the *prima facie* issue] is based on its own observations, the first stage of the *Batson* inquiry will necessarily collapse." 348 Ill. App. 3d at 178. The majority recognized that "allowing a trial court to *sua sponte* raise a *Batson* issue creates the potential for abuse"; however, the court majority rejected the dissent's call for the trial court to make a record and "articulate the basis for the perceived *Batson* violation" as "a meaningless rhetorical exercise" and "mindless adherence to the three-step analysis of *Batson*." 348 Ill. App. 3d at 178. The appellate majority then noted that "great deference" is accorded the trial court's ultimate determination on review (348 Ill. App. 3d at 178, citing *People v. Harris*, 206 Ill. 2d 1, 17 (2002)) and concluded that the trial court, "weigh[ing] the credibility of defense counsel's explanation" for defendant's peremptory challenge, "could rationally find a motive to discriminate against African-Americans, women, or both groups simultaneously." 348 Ill. App. 3d at 178-79.

Justice Gallagher, specially concurring, acknowledged that "it is arguable that the excusal did not constitute a pattern of strikes against African-Americans, since defense counsel also excused a white male and a white female"; however, he believed there was at least "an *inference* of purposeful discrimination." (Emphasis in original.) 348 Ill. App. 3d at 182 (Gallagher, J., specially concurring). Justice Gallagher stated, "[I]t is inferable that the court believed that a *prima facie* case was established when defense counsel excluded a second African-American." The justice concluded, "Whether one agrees or disagrees is not the point. The point is that step one of the *Batson* process was followed." 348 Ill. App. 3d at 182 (Gallagher, J., specially concurring).

Presiding Justice Frossard, dissenting, disagreed, arguing that the trial court improperly "collapsed what ought to be a three-step procedure into an undifferentiated review of the jury selection process." 348 Ill. App. 3d at 183 (O'Mara Frossard, P.J., dissenting). Presiding Justice O'Mara Frossard noted that the record in this case fails to reflect that the trial court examined relevant factors bearing upon the establishment of a *prima facie* case of discrimination. 348 Ill. App. 3d at 183 (O'Mara Frossard, P.J., dissenting). Presiding Justice O'Mara Frossard argued that "*Hudson* is not determinative in the factual context of this case, where a trial judge *sua sponte* raised a reverse-*Batson* violation and bypassed any determination of a *prima facie* case by requesting race-neutral explanations from defense counsel for his peremptory challenge." 348 Ill. App. 3d at 185 (O'Mara Frossard, P.J., dissenting). The dissent observed that the "trial judge's failure to make a record of the *prima facie* case regarding this uncommon *sua sponte* reverse-*Batson* challenge makes proper review of the *Batson* ruling impossible." 348 Ill. App. 3d at 185 (O'Mara Frossard, P.J., dissenting).

Presiding Justice O'Mara Frossard also pointed out that the majority failed to address defendant's argument that *Batson* is not applicable to combined race-gender discrimination, suggesting that the majority's resort to our opinion in *Hudson* did not obviate the need to determine whether the trial court ultimately based its rejection of defendant's peremptory

challenge on its perception of combined race-gender discrimination. 348 Ill. App. 3d at 186 (O'Mara Frossard, P.J., dissenting). The dissent correctly observes that this court has held the "focus of *Batson* is on the exclusion of members of a single identifiable group, not of different groups considered together" (348 Ill. App. 3d at 186 (O'Mara Frossard, P.J., dissenting), citing *People v. Harris*, 164 Ill. 2d 322, 344 (1994)), and an appellate panel has actually held that *Batson* does not apply "to alleged combined race-gender discrimination." 348 Ill. App. 3d at 186 (O'Mara Frossard, P.J., dissenting), citing *People v. Washington*, 257 Ill. App. 3d 26, 34 (1993). We note in passing that this court mentioned the appellate court's disposition in *Washington* in the course of our opinion in *Harris*, citing the appellate court's holding as an analogous proposition lending support to our own decision, "declin[ing] *** to expand the *Batson* rule to embrace the simultaneous consideration of different racial or ethnic groups." See *Harris*, 164 Ill. 2d at 344. Presiding Justice O'Mara Frossard concluded:

> "[T]he trial court's failure to articulate the circumstances that demonstrate a *prima facie* case of purposeful discrimination leaves unanswered the question of whether the court's finding a *Batson* violation was based on combined race-gender discrimination. The trial judge, by collapsing the *Batson* stages and failing to make findings of fact to clarify the record regarding the relevant circumstances demonstrating a *prima facie* case of purposeful discrimination, has made proper review of this race-gender issue impossible." 348 Ill. App. 3d at 186 (O'Mara Frossard, P.J., dissenting).

Citing the procedure this court sanctioned in *People v. Garrett*, 139 Ill. 2d 189, 194 (1990), Presiding Justice O'Mara Frossard would have retained jurisdiction and remanded "for a three-step *Batson* hearing on the present record and any additional record the trial court or parties decide to make." 348 Ill. App. 3d at 187 (O'Mara Frossard, P.J., dissenting). If the circuit court then found a *Batson* violation, Presiding Justice O'Mara Frossard would have required the circuit court to clarify the nature of the violation, *i.e.,* race, gender, or combined race-

gender discrimination. 348 Ill. App. 3d at 187 (O'Mara Frossard, P.J., dissenting).

Unlike the *Batson* issue, there was no separate opinion written with respect to defendant's *Apprendi* issue. The appellate court held that an *Apprendi* violation had occurred because the judge–rather than the jury–found the facts necessary to extend the sentencing range applicable to defendant. 348 Ill. App. 3d at 179-80. However, relying upon this court's decisions in *Swift* and *People v. Thurow*, 203 Ill. 2d 352, 363 (2003), the appellate court determined that "an *Apprendi* violation may be subject to a plain-error or harmless-error analysis" (348 Ill. App. 3d at 180) and ultimately concluded, based on the uncontested evidence of defendant's position in the gang hierarchy, that the *Apprendi* violation was harmless error. 348 Ill. App. 3d at 181. Finally, the court rejected defendant's contention that the Illinois Constitution affords greater protection than its federal counterpart, concluding:

> "[W]e find nothing in defendant's discussion of the history of criminal defendants' right to a jury trial in Illinois that compels us to break lockstep and conclude that the harmless-error analysis of *Thurow* is impermissible under the Illinois Constitution." 348 Ill. App. 3d at 181.

## ANALYSIS

We begin our analysis with a review of the function of peremptory challenges in our judicial system and of relevant principles articulated by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69,106 S. Ct. 1712 (1986), and other pertinent cases.

In *Swain v. Alabama*, 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965), the Supreme Court stated that the peremptory challenge is " 'one of the most important of the rights secured to the accused' " in our criminal justice system because the challenge eliminates "extremes of partiality on both sides" and assures the parties that the case will be decided on the basis of evidence placed before the jurors. *Swain*, 380 U.S. at 219, 13 L. Ed. 2d at 772, 85 S. Ct. at 835, quoting *Pointer v. United*

*States*, 151 U.S. 396, 408, 38 L. Ed. 208, 214, 14 S. Ct. 410, 414 (1894). See also *People v. Daniels*, 172 Ill. 2d 154, 165 (1996) (relying upon the foregoing proposition).

In *Batson*, the Supreme Court again acknowledged the important role peremptory challenges occupy in our trial procedures and held, as a constitutional matter, that peremptory challenges may not be used to exclude potential jurors based solely on race. *Batson*, 476 U.S. at 98-99, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724. The Court, in *Batson*, held that a *prosecutor* cannot utilize peremptory challenges to excuse potential jurors solely on the basis of their race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719. In *Batson*, the defendant and the potential juror in question shared the same racial characteristics.

Subsequently, in *Powers v. Ohio*, 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366 (1991), the Court held that a defendant in a criminal trial has standing to challenge the State's use of peremptory challenges to exclude prospective jurors on account of their race *irrespective of* whether the defendant and the excluded jurors share the same racial characteristics. In so holding, the Court determined that a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he has suffered a concrete injury, that he has a close relation to the third party, and there exists some hindrance to the third party's ability to protect its own interests. *Powers*, 499 U.S. at 410-11, 113 L. Ed. 2d at 425, 111 S. Ct. at 1370-71. The Court found that *jurors* have rights under its *Batson* jurisprudence, stating, although "[a]n individual juror does not have a right to sit on any particular petit jury, *** he or she does possess the right not to be excluded from one on account of race." *Powers*, 499 U.S. at 409, 113 L. Ed. 2d at 424, 111 S. Ct. at 1370. Speaking of discriminatory jury-selection practices, the Court stated: "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed *the court* to adhere to the law throughout the trial of the cause." (Emphasis added.) *Powers*, 499 U.S. at 412, 113 L. Ed. 2d at 426, 111 S. Ct. at 1371. The Court concluded that the defendant was a proper party to raise a violation of *a juror's* rights under *Batson*.

Two justices of the Court were not of the belief that jurors actually possess rights in the jury-selection process which are independent of the rights of the parties. See *Powers*, 499 U.S. at 417-31, 113 L. Ed. 2d at 429-39, 111 S. Ct. at 1374-82 (Scalia, J., dissenting, joined by Rehnquist, C.J.). In dissent, Justice Scalia wrote:

> "To affirm that the Equal Protection Clause applies to strikes of individual jurors is effectively to abolish the peremptory challenge. *** Not only is it implausible that such a permanent and universal feature of our jury-trial system is unconstitutional, but it is unlikely that its elimination would be desirable. The peremptory challenge system has endured so long because it has unquestionable advantages. As we described in *Holland*, 493 U.S. at 484, it is a means of winnowing out possible (though not demonstrable) sympathies and antagonisms on both sides, to the end that the jury will be the fairest possible. In a criminal-law system in which a single biased juror can prevent a deserved conviction or a deserved acquittal, the importance of this device should not be minimized." *Powers*, 499 U.S. at 425, 113 L. Ed. 2d at 434-35, 111 S. Ct. at 1378 (Scalia, J., dissenting, joined by Rehnquist, C.J.).

Subsequently, the Court again focused on the equal protection rights of excluded jurors in its decision in *Georgia v. McCollum*, 505 U.S. 42, 120 L. Ed. 2d 33, 112 S. Ct. 2348 (1992). In *McCollum*, the Court held that the constitution prohibits not only the prosecution, but also a criminal defendant, from engaging in purposeful racial discrimination in the exercise of peremptory challenges. *McCullom*, 505 U.S. at 59, 120 L. Ed. 2d at 51, 112 S. Ct. at 2359. In so holding, the Court recognized the *State's* standing to attack the defendant's use of peremptory challenges on racial grounds, observing that, "[a]s the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial." *McCollum*, 505 U.S. at 56, 120 L. Ed. 2d at 49, 112 S. Ct. at 2357.

In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994), the Supreme Court again extended the reasoning, prohibitions, and procedures of *Batson*, this time to peremptory strikes based on gender. Reminiscent of the analysis employed in *Powers* and *McCullom*, the Court in *J.E.B.* stated: "Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B.*, 511 U.S. at 140, 128 L. Ed. 2d at 104, 114 S. Ct. at 1427. The Court pointedly observed that the "[d]iscriminatory use of peremptory challenges may create the impression that the judicial system has acquiesced in suppressing full participation by one gender." *J.E.B.*, 511 U.S. at 140, 128 L. Ed. 2d at 104, 114 S. Ct. at 1427.

Five justices wrote or subscribed to separate opinons in *J.E.B.*, either concurring and expressing concerns, or dissenting outright. Justice O'Connor, concurring in the judgment, expressed her concerns over the proliferation of "*Batson* minihearings" in the state and federal trial courts, and over the further erosion of the role of the peremptory challenge, which she acknowledged to be a valuable practice that "helps produce fair and impartial juries." *J.E.B.*, 511 U.S. at 147, 128 L. Ed. 2d at 108, 114 S. Ct. at 1431 (O'Connor, J., concurring). Justice Kennedy, who also concurred in the judgment, expressed this perplexing cautionary concern: "We do not prohibit racial and gender bias in jury selection only to encourage it in jury deliberations. Once seated, a juror should not give free rein to some racial or gender bias of his or her own." *J.E.B.*, 511 U.S. at 153, 128 L. Ed. 2d at 112, 114 S. Ct. at 1434 (Kennedy, J., concurring). Justice Scalia–with whom Chief Justice Rehnquist and Justice Thomas joined in dissent–expressed his view that the *Batson* principle is "theoretically boundless" (*J.E.B.*, 511 U.S. at 161, 128 L. Ed. 2d at 117, 114 S. Ct. at 1438 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.)), he reiterated his criticism of the "uniquely expansive third-party standing analysis of *Powers*" (*J.E.B.*, 511 U.S. at 158-59, 128 L. Ed. 2d at 115-16, 114 S. Ct. at 1437 (Scalia, J., dissenting, joined by Rehnquist,

C.J., and Thomas, J.)), and he offered the following analysis of the equal protection issue:

> "The core of the Court's reasoning is that peremptory challenges on the basis of any group characteristic subject to heightened scrutiny are inconsistent with the guarantee of the Equal Protection Clause. That conclusion can be reached only by focusing unrealistically upon individual exercises of the peremptory challenge, and ignoring the totality of the practice. Since all groups are subject to the peremptory challenge (and will be made the object of it, depending upon the nature of the particular case) it is hard to see how any group is denied equal protection." *J.E.B.*, 511 U.S. at 159, 128 L. Ed. 2d at 116, 114 S. Ct. at 1437 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.).

Suffice it to say that the expansion of the *Batson* principle, and the correlative, creeping circumscription of peremptory challenges, has not proceeded without misgivings and dissent among the justices of the Supreme Court.

We turn now to the procedure the Court established to effectuate the *Batson* principle. In *Batson*, the Supreme Court established a three-step process for evaluating alleged discrimination in jury selection. The Court held that the party objecting to the exercise of a peremptory challenge is first required to establish a *prima facie* case of purposeful discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." See *Batson*, 476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721. If the objector demonstrates a *prima facie* case, the burden then shifts to the other party to explain his challenge by articulating a nondiscriminatory, "neutral" explanation related to the particular case to be tried. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24. Finally, the trial court considers the reasons provided for the peremptory strike. As part of that process, the objector may argue that the reasons given are pretextual. The trial court then makes a final determination as to whether the objector has established

purposeful discrimination. *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88- 89, 106 S. Ct. at 1724.

In the course of implementing the principles and procedures of *Batson*, this court has repeatedly cautioned that the first and second steps in the process "should not be collapsed into a single, unitary disposition that dilutes the distinctions between a *** *prima facie* showing of discrimination and the *** production of neutral explanations for its peremptory challenges." *People v. Wiley*, 156 Ill. 2d 464, 475 (1993); see also *People v. Jackson*, 145 Ill. 2d 43, 98 (1991) (warning trial courts not to omit the first step in the *Batson* analysis altogether), *vacated on other grounds*, 506 U.S. 802, 121 L. Ed. 2d 5, 113 S. Ct. 32 (1992); *People v. Garrett*,139 Ill. 2d 189, 201 (1990). Accord *Purkett v. Elem*, 514 U.S. 765, 767-68, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1770-71 (1995).

In *Batson*, the Supreme Court stated that courts should consider "all relevant circumstances" in deciding whether a party has made the requisite showing of a *prima facie* case. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723. This court has held, in determining whether the objector has demonstrated purposeful discrimination against African-Americans at the *prima facie* stage, a trial judge should consider, *inter alia*, the following relevant factors:

> "(1) racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses." *People v. Williams*, 173 Ill. 2d 48, 71 (1996).

The list of factors would obviously be modified appropriately to address claims of purposeful discrimination directed at other protected groups.

The party attempting to exercise a peremptory challenge is not required to provide race-neutral reasons for the exercise of its peremptory challenge if a *prima facie* case of purposeful racial discrimination has not been demonstrated. See *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88,106 S. Ct. at 1723. A ruling on the sufficiency of a *prima facie* case of purposeful discrimination is a finding of fact that will not be reversed unless it is against the manifest weight of the evidence. *People v. Coleman*, 155 Ill. 2d 507, 514 (1993).

As this court has noted, a trial court's *third stage* finding on the ultimate issue of discrimination rests largely on credibility determinations. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 527 (2000). Consequently, the trial court's finding is entitled to "great deference" and will not be set aside unless clearly erroneous. *McDonnell*, 192 Ill. 2d at 527; *People v. Munson*, 171 Ill. 2d 158, 175 (1996). As the Supreme Court observed in *Hernandez v. New York*, 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869 (1991), there will seldom be much evidence bearing upon the ultimate question of discrimination and the "best evidence often will be the demeanor of the attorney who exercises the challenge." The evaluation of the attorney's state of mind is most often "based on demeanor and credibility" and thus "lies 'peculiarly within the trial judge's province.' " *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854 (1985). As the Supreme Court acknowledged in *Hernandez*, the credibility of the attorney's explanation "goes to the heart of the equal protection analysis, *and once that has been settled, there seems nothing left to review*." (Emphasis added.) *Hernandez*, 500 U.S. at 367, 114 L. Ed. 2d at 410, 111 S. Ct. at 1870.

With these principles in mind, we turn to the question of the trial court's standing and authority to raise a *Batson* issue *sua sponte.* Applying the Supreme Court's three criteria for standing, and our own state principles, it seems clear to us that trial courts possess such authority.

˘19˘

First, the Supreme Court's pronouncements dictate the conclusion that a trial court suffers an injury as significant as either of the parties when discrimination takes place in jury selection. In *Powers*, the Court explicitly stated that the "overt wrong" of discrimination in jury selection "casts doubt over the obligation of *** the court to adhere to the law throughout the trial of the cause." *Powers*, 499 U.S. at 412, 113 L. Ed. 2d at 426, 111 S. Ct. at 1371. In *J.E.B.*, the Court observed that the "[d]iscriminatory use of peremptory challenges may create the impression that the judicial system has acquiesced in suppressing full participation" by the aggrieved juror. *J.E.B.*, 511 U.S. at 140, 128 L. Ed. 2d at 104, 114 S. Ct. at 1427. In short, perceived discrimination in jury selection reflects negatively on the integrity of the judge who presides over the proceedings.

Second, as the appellate court in this case observed, "the relationship between the trial court and the jury is even closer than the relationship between the parties and the jury." 348 Ill. App. 3d at 175. As the appellate court noted: "The trial court and the jury are the only participants in the trial duty bound to act impartially, and the jury relies on the trial court for its instructions ***." 348 Ill. App. 3d at 175. Indeed, the jurors look to the trial judge as the overseeing authority and impartial arbiter of the proceedings, and the judge is the only participant in the trial who will supervise and direct their activities while they serve as jurors. As a practical matter, the presiding judge is an authority figure for those who serve as jurors. Thus, we find that the second criterion for standing has been satisfied.

Finally, the Supreme Court has already found that the third criterion–hindrance to the third party's ability to protect its own interests–exists in this context. In *Powers*, the Court concluded: "[T]here exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation. [Citations.] The reality is that a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights." *Powers*, 499 U.S. at 415, 113 L. Ed. 2d at 428, 111 S. Ct. at 1373.

˘20˘

Thus, Supreme Court precedent supports our conclusion that a trial court has the standing to raise a *Batson* issue *sua sponte.*

Moreover, this court has held that courts possess the inherent power "to enable them to perform their judicial functions with *** dignity." *People ex rel. Bier v. Scholz*, 77 Ill. 2d 12, 19 (1979). Since the "[d]iscriminatory use of peremptory challenges may create the impression that the judicial system has acquiesced in suppressing full participation" of potential jurors (*J.E.B.*, 511 U.S. at 140, 128 L. Ed. 2d at 104, 114 S. Ct. at 1427), it follows that the trial judge should have the means to preserve the dignity of his or her office. Furthermore, this court has held that a trial court has the *right*–though not the *duty*–to remove a juror for cause. See *People v. Metcalfe*, 202 Ill. 2d 544, 557 (2002). Granting trial courts the authority to raise *Batson* issues *sua sponte* is merely a logical extension of the powers circuit courts already possess. Thus, we conclude that a trial court has the authority to raise a *Batson* issue *sua sponte* in appropriate circumstances.

Our holding in this regard is consistent with the conclusion reached by courts of other jurisdictions. See *Hitchman v. Nagy*, 382 N.J. Super. 433, 889 A.2d 1066 (2006); *People v. Bell*, 473 Mich. 275, 702 N.W.2d 128 (2005); *State v. Evans*, 100 Wash. App. 757, 998 P.2d 373 (2000); *Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686 (1999); *Williams v. State*, 669 N.E.2d 1372 (Ind. 1996); *Brogden v. State*, 102 Md. App. 423, 649 A.2d 1196 (1994); *Lemley v. State*, 599 So. 2d 64 (Ala. Crim. App. 1992). However, as the court observed in *Hitchman*, courts so holding have generally been careful to insist upon a clear indication of a *prima facie* case of purposeful discrimination *before* trial courts are authorized to act. *Hitchman*, 382 N.J Super. at 444-47, 889 A.2d at 1072-74. We agree that a *prima facie* case of discrimination must be abundantly clear before a trial court acts *sua sponte.* Moreover, when a trial court chooses to act *sua sponte,* it must make an adequate record, consisting of all relevant facts, factual findings, and articulated legal bases for both its finding of a *prima facie* case and for its ultimate determination at the third stage of the *Batson* procedure.

In this regard, we reject the appellate majority's reliance upon a general statement from this court's opinion in *People v. Hudson*, 157 Ill. 2d 401, 427-28 (1993), as a means to avoid consideration of "whether combined race-gender discrimination can be used to establish a *prima facie* case under *Batson.*" 348 Ill. App. 3d at 176-77. The appellate majority concluded that "once the trial court rules on the ultimate question of discrimination, the question of whether a *prima facie* case had been established is moot." 348 Ill. App. 3d at 177, citing *Hudson*, 157 Ill. 2d at 427. Such a statement does indeed appear in *Hudson*, on more than one occasion; however, the statement has been taken out of its original context, and it does not comport with the procedural requirements we hereby adopt when a trial court acts *sua sponte* to raise a *Batson* issue.

In *Hudson*, this court quoted from the Supreme Court's opinion in *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991): " 'Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot.' " *Hudson*, 157 Ill. 2d at 427, quoting *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866. We later observed: "[T]his court has recently held that once the trial court rules on the ultimate question of discrimination, the question of whether the defendant established a *prima facie* case became moot. *People v. Mitchell* (1992), 152 Ill. 2d 274, 289-90." *Hudson*, 157 Ill. 2d at 427-28. This court then concluded its discussion of the issue, stating, "Pursuant to *Hernandez*, the question of whether defendant in the instant case established a *prima facie* case of discrimination became moot *when the trial court found the State's explanations were valid.*" (Emphasis added.) *Hudson*, 157 Ill. 2d at 428. Similarly, in *Mitchell*, this court cited *Hernandez* in support of its conclusion that "the question of whether defendant established a *prima facie* case of racial discrimination became moot *when the trial court found that the prosecutor's explanations for the challenges were valid and neutral.*" (Emphasis added.) *Mitchell*, 152 Ill. 2d at 289. Indeed, in *Hernandez*, the reasons given by the prosecutor were also

deemed valid and neutral. *Hernandez*, 500 U.S. at 372, 114 L. Ed. 2d at 414, 111 S. Ct. at 1873.

Clearly, whether a *prima facie* case of discrimination exists at the outset becomes a moot point after the trial court finds valid and race-neutral reasons supporting the peremptory challenge and a court of review ultimately affirms that ruling. The party exercising a peremptory challenge suffers no prejudice in that instance because the juror in question is excused pursuant to that party's original challenge. The converse, however, is not true. Where a *prima facie* case does *not* exist, a party whose challenge is ultimately denied *is* prejudiced, because the matter should not have been advanced to the second step of the *Batson* process, and he should never have been compelled by the trial court to offer justification for his challenge in the first place. By definition, a "*prima facie* case" entails "[t]he establishment of a legally required rebuttable presumption" or "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." Black's Law Dictionary 1228 (8th ed. 2004). In every procedural context wherein a *prima facie* case is required, the party with the burden of establishing a *prima facie* case must first meet its burden in order to advance the litigation to subsequent stages and, ultimately, to be entitled to relief. See generally *People v. Orth*, 124 Ill. 2d 326, 338 (1988) ("Since the [initial] burden was upon the [suspended] motorist [to present a *prima facie* case for rescission], the circuit court erred: first, by requiring the State to go forward with evidence justifying the suspension, and, second, by rescinding the suspension even though the motorist had not presented any evidence for rescission"). The burden of establishing a *prima facie* case of purposeful discrimination in jury selection is on the party making the *Batson* claim. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 526 (2000). It defies procedural logic that proof of a *prima facie* case could be insufficient to advance the *Batson* process to the second and third steps; yet, the party attempting to exercise its challenge could ultimately lose when the matter is erroneously advanced to the subsequent stages. Therefore, when a party is ultimately *denied* its right to exercise a peremptory challenge, we hold

that matters bearing upon the first stage of the *Batson* process are properly within the scope of appellate review and not moot.

Comprehensive appellate review of *Batson* proceedings, and adequate records and findings enabling such a review, are critical when a trial court decides to raise a *Batson* claim *sua sponte*. There are at least three reasons why this is so. First, a litigant objecting to an opposing party's peremptory challenge, as the party making the *Batson* claim, would normally have the burden of establishing a *prima facie* case of discrimination, and the *ultimate* burden of establishing purposeful discrimination. See *McDonnell*, 192 Ill. 2d at 526. When the trial court acts *sua sponte*, it relieves a litigant of those burdens. Second, when a trial court acts *sua sponte*, it necessarily means that the opposing party–in this case the State–has failed to act. The evidentiary implications associated with that inaction are not conclusive, but they are nonetheless cause for concern. Inaction may suggest that the opposing party did not perceive circumstances indicating purposeful discrimination, which in some instances may indicate that no such circumstances exist. In that situation, articulation of the bases for the trial court's finding is essential, because the normal adversarial process will not provide the requisite bases and record. Finally, without an adequate record, consisting of all relevant facts, factual findings, and articulated legal bases for both the trial court's finding of a *prima facie* case and its ultimate determination at the third stage of the *Batson* procedure, the trial court's rulings may be virtually immune from appellate review. If, for example, we were to hold–as the appellate court did–that the existence of a *prima facie* case is a moot point, we would not be able to review the circuit court ruling that required defense counsel to justify his peremptory challenge of Gomez. Once that procedural frontier is crossed, the outcome of the *Batson* inquiry then hinges upon whatever facts the trial court has deigned to provide for us and, more importantly, whether the trial court finds counsel's explanation for the peremptory challenge credible and benign. As the Supreme Court noted in *Hernandez*, evaluation of the attorney's state of mind is most often "based on demeanor and credibility" and thus "lies

'peculiarly within the trial judge's province' " (*Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854 (1985)), "*and once that has been settled, there seems nothing left to review.*" (Emphasis added.) *Hernandez*, 500 U.S. at 367, 114 L. Ed. 2d at 410, 111 S. Ct. at 1870. Thus, the inability to review the propriety of a trial court's first-stage *Batson* ruling, combined with the problems associated with *sua sponte* action and a deficient record on appeal, might well result in a decision that is for all intents and purposes unreviewable, giving trial courts *carte blanche* to apply–or misuse–the principles of *Batson* in any way they wish. That specter is the impetus for the procedural requirements we adopt today. Indeed, strict adherence to the three-step procedure specified by the Supreme Court would seem to be the surest way to guarantee compliance with *Batson* principles.

We now examine the pertinent portions of the record in this case. During defense counsel's brief preliminary questioning of juror Gomez, counsel inquired about Gomez's employment with an out-patient clinic of Cook County Hospital. Gomez acknowledged that Cook County Hospital is known for the treatment of gunshot victims and, as a part of her employment at the clinic, she has contact with patients, "checking them in." When defense counsel sought to excuse Gomez, the trial judge raised the *Batson* issue, and compelled defense counsel to "articulate a basis" for the peremptory challenge, without any mention of a *prima facie* case of discrimination or of any facts bearing upon that issue. It was only *after* defense counsel had begun to state the nondiscriminatory basis for his challenge–Gomez's connection to the clinic and victims of violent crime–that the court interrupted, noting that "Mrs. Deloris Gomez appears to be an African American." When counsel observed that he had previously accepted an African-American woman to sit on the jury, the court quickly pointed out that Gomez was the second African-American woman that the defense had sought to exclude. The court also stated it was counsel's articulated reason for the peremptory challenge that was of particular concern. Obviously, the articulated reason for a challenge is a matter of "concern" only *after* a *prima facie*

case has been established. The existence of a *prima facie* case is a prerequisite for the court to demand an explanation. In any event, the court then stated for the record, "If the State in fact had done this, I certainly would have found they would have established a *prima facie* case by the very reason–what I'm going to do is allow Ms. Gomez–allow her to be seated, not excuse her on the basis of your peremptory." It is telling that the trial court never explained "the very reason" it believed a *prima facie* case of discrimination existed. The court simply stated, "I feel under these circumstances the reasons given by you, Mr. Decker, do not satisfy this Court. As far as I'm concerned, it's more than a *prima facie* case of discrimination against Mrs. Gomez. I'm not going to allow her to be excused."

Defense counsel then asked for, and was granted, leave to conduct further questioning of Gomez. In the course of that questioning, Gomez conceded that some of the patients she interacts with are "victims of gun violence"; however, she maintained that fact would not affect her ability to be fair. After questioning Gomez, defense counsel explained that he was "not trying to excuse a juror because of her race." Counsel then stated that one consideration was his attempt to "get some impact from *** men in the case" as the jury panel was then composed of "predominantly women." Counsel further informed the court that he was familiar with the clinic where Gomez worked and it was "wall to wall victims and patients." Counsel described it as "a disturbing place." The court responded: "I've had the opportunity to question Deloris Gomez[,] who I find is a very intelligent lady. I considered her statements very carefully, her testimony very carefully, and I again feel that she shall sit as a juror." In view of the court's ruling, defense counsel then chose to exercise his fourth peremptory challenge against Kurich. With respect to *that* peremptory challenge, the judge responded, "With reluctance, I will allow it."

Because the trial court did not state the basis for its finding of *prima facie* discrimination, we do not know whether the trial court believed the peremptory challenge defendant sought to exercise against Gomez represented an instance of racial discrimination, or gender discriminaton, or combined race-

gender discrimination. We do know that defendant had exercised a peremptory challenge against an African-American woman previously, and had accepted another African-American woman for service on the jury. Morever, the record indicates that defense counsel had previously exercised peremptory challenges against Rosalee Huizenga and Thomas Hickey, whose racial characteristics are not specified in the record. In his opening brief, defendant states that Huizenga "was not a black woman and Thomas Hickey [was] a white male." The State, in its own statement of facts, merely names Huizenga and Hickey as persons who were excused by the defense. The State does not dispute defendant's representation regarding their racial characteristics. In fact, in arguing that the trial court did *not* act on the basis of perceived race-gender discrimination, the State asserts that "the trial court's remarks make it clear that the court's *sua sponte* reverse-*Batson* challenge was grounded solely on the race of Ms. Gomez." The State's argument in that respect necessarily admits that Hickey was white, because, if he was not, the trial court surely would have commented on the use of a peremptory to excuse him, and it did not. Given the statements of the parties and the court on the record, it is reasonable to assume, at least, that Huizenga was not an African- American woman, and Hickey was a white male.

Normally, the party asserting a *Batson* claim has the burden of proving a *prima facie* case and preserving the record, and any ambiguities in the record will be construed against that party. *People v. Evans*, 186 Ill. 2d 83, 92 (1999); see also *People v. Furdge*, 332 Ill. App. 3d 1019, 1031 (2002). Given the requirements we impose today, when a trial court acts *sua sponte*, the *trial court* must see to it that adequate facts are preserved in the record to support its ruling, and the trial court in this instance has not done so.

This court has held that the mere number of African-American venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. *People v. Heard*, 187 Ill. 2d 36, 56 (1999); *Garrett*, 139 Ill. 2d at 203. Where a party claiming a *Batson* violation has not provided any other information to support his claim of

discriminatory jury selection, he has failed to establish a *prima facie* case. *Heard*, 187 Ill. 2d at 56. The number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the *voir dire* answers of those who were struck compared to the answers of those who were not struck. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005). As previously noted, in determining whether the objector has demonstrated purposeful discrimination against African-Americans at the *prima facie* stage, a trial judge should consider the following relevant factors:

> "(1) racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses." *People v. Williams*, 173 Ill. 2d 48, 71 (1996).

We also note, when a *Batson* claim is made regarding discrimination against a particular race, the unchallenged presence of jurors of that race on the seated jury is a factor properly considered (*People v. Brown*, 172 Ill. 2d 1, 35 (1996); see *People v. Martinez*, 335 Ill. App. 3d 844, 854 (2002)) and tends to weaken the basis for a *prima facie* case of discrimination (*Ochoa-Vasquez*, 428 F.3d at 1044-45).

Examining the facts that *are* included in this record, in the framework of the foregoing factors, we see no clear indication of a *prima facie* case of racial discrimination. The only factor that appears to weigh in favor of finding a *prima facie* case is the fact that defendant is Hispanic and both the victim and Gomez were African- American. Given the current state of the record, we find that none of the other considerations supports

the trial court's apparent belief that a *prima facie* case existed. First, we do not find an impermissible pattern of strikes against African-Americans or a disproportionate use of peremptory challenges against African-American venirepersons. We know only that, prior to the attempt to strike Gomez, defense counsel used peremptory challenges to strike one African-American woman, but he also accepted one African-American woman for service on the jury. Counsel also struck one woman who was not African-American and a white male. It seems to us that for this court to say that a pattern developed when defendant attempted to strike a second African-American woman, we would have to find that a pattern would have developed if defendant had moved to strike a second woman who was not of African-American heritage or a second white male. We do not believe that inference is warranted or wise as it would result in precedent that a pattern develops anytime a party strikes more than one juror of any race or gender. Second, we are unable to compare the level of African-American representation in the venire with that of defendant's jury–as Illinois courts have done so effectively in prior cases (see *People v. Edwards*, 301 Ill. App. 3d 966, 973-74 (1998))–because the requisite information has not been made a part of the record on appeal. Other than the African-American woman accepted by defendant, we do not know the race of any other members of the jury that convicted defendant. Third, we do not find the questions or statements of defense counsel particularly troubling prior to the time that the trial court advanced the matter to the second stage of the *Batson* procedure and demanded an explanation from counsel. The questions asked by counsel pertained to Gomez's employment at a clinic and her contact with the victims of violent crime. Defendant was on trial for a crime of violence. We note in this regard that the Seventh Circuit Court of Appeals has held that "a challenge based on a juror's social or medical work is race-neutral and understandable" in the context of a criminal case. See *United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999), citing *Coulter v. Gilmore*, 155 F.3d 912, 919-20 (7th Cir. 1998). While defense counsel did, eventually, make comments suggesting an impermissible

gender-based motive for removing *Gomez* from jury service, that remark was made *after* the court had already denied the peremptory challenge, and it is unclear whether the factor had a bearing on the court's ruling as the basis for the court's ruling itself is uncertain. Finally, from this record, we are unable to say that the African-Americans defendant sought to exclude were a heterogeneous group sharing race as their only common characteristic. In short, the record in its current state does not reveal a *prima facie* case of racial discrimination, if indeed that–as opposed to race-gender discrimination–was the basis for the trial court's *sua sponte* action.

In sum, we hold that a trial court may raise a *Batson* issue *sua sponte*, but it may do so only when a *prima facie* case of discrimination is abundantly clear. Moreover, the trial court must make an adequate record consisting of all relevant facts, factual findings, and articulated bases for both its finding of a *prima facie* case and for its ultimate determination at the third stage of the *Batson* procedure. The record in this case is insufficient to demonstrate either a *prima facie* case of racial discrimination or the bases for the trial court's rulings.

Although we have previously warned circuit courts against collapsing the *Batson* procedure, it was, perhaps, not clear until today that the existence of a *prima facie* case of discrimination would continue to be a relevant issue for purposes of appeal where, as here, the circuit court ruled upon the ultimate issue of discrimination, and decided that issue adversely to the party attempting to exercise a peremptory challenge. In this case, there may be evidence that was not made a part of the record because the trial court believed that the preliminary matter of a *prima facie* case would become moot after it ruled on the third-stage issue.

In light of that possibility, we believe it is appropriate to remand this cause to the circuit court for a limited hearing to allow the trial judge an opportunity to articulate the bases for his *Batson* rulings. We are particularly interested in findings of fact and conclusions of law with respect to the threshold question of a *prima facie* case of discrimination, and clarification as to the *kind* of discrimination the trial judge

believed to be in evidence when the defense sought to excuse juror Gomez, *i.e.,* race, gender, or combined race-gender. We take judicial notice of the fact that the original trial judge, Judge Fiala, has now retired from the bench. Given the unusual procedural circumstances of this case, he may provide this information via affidavit if he so desires, pointing to pertinent information already in the record, and identifying any physical evidence not currently of record  such as juror questionnaires or profiles  that the court and the parties utilized in the jury-selection process. We also offer Judge Fiala an opportunity to explain his "reluctance" to allow a subsequent peremptory challenge against juror Kurich. In that respect, we note that a defendant is entitled to an "impartial judge," meaning one who is not predisposed to rule in a given manner. See *People v. Williams,* 124 Ill. 2d 300, 308 1988 . Following the reception of this evidence, the circuit court shall file any supplemental record in this matter with the clerk of this court within 60 days of the issuance of the mandate in this matter, accompanied by a record of the proceedings on remand, and any request by the parties to submit additional briefs or further argue issues pertaining to the threshold question of a *prima facie* case of discrimination. After proceedings on remand have been completed, and any supplemental arguments have been considered, this court will announce its judgment on any and all pending issues requiring resolution at that time. See *Garrett*, 139 Ill. 2d at 195.

*Cause remanded with directions.*