# Illinois Official Reports

## Appellate Court

---

***People v. Sanders*, 2015 IL App (4th) 130881**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRY SANDERS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0881 |
| Filed | June 5, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-23; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and John M. McCarthy (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Aimee Sipes Johnson (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Steigmann and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        In May 2013, a jury found defendant, Derry "Jay" Sanders, guilty of two counts of criminal sexual assault. On appeal, defendant asserts the trial court (1) improperly denied his *Batson* challenge (*Batson v. Kentucky*, 476 U.S. 79, 89 (1986)), and (2) erred when it prohibited defense counsel from introducing the content of text messages the complaining witness, B.J., sent another man the night of the offense. We affirm.

¶ 2                                          I. BACKGROUND

¶ 3        In January 2012, the State indicted defendant, a Caucasian male, on two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2010)) and one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2010)). Defendant entered an open plea of guilty to the unlawful possession charge and proceeded to jury trial on the two criminal sexual assault charges.

¶ 4                                     A. Motion *in Limine*

¶ 5        In May 2012, the State filed a motion *in limine* to exclude testimony regarding B.J.'s sexual history under section 115-7 of the Code of Criminal Procedure of 1963 (the rape-shield statute) (725 ILCS 5/115-7 (West 2010)). Specifically, the State sought to prevent defendant from introducing testimony regarding sexually suggestive text messages B.J. sent to Nick Lacomba (a bouncer at Fat Jacks bar in Bloomington, Illinois) on the night of the offense.

¶ 6        At a February 2013 hearing on the motion, the State argued the text messages were evidence of B.J.'s sexual history under the rape-shield statute and had no relevancy to the case against defendant. Defendant responded the sexual assault charges against him were predicated upon defendant knowing B.J. was unable to give knowing consent and the text messages were relevant because they related to B.J.'s cognitive abilities. Defendant further argued the text messages were not covered by the rape-shield statute because they were only statements relating to sex–not actual prior sexual activity.

¶ 7        Following the hearing, the trial court granted the State's motion in part and denied the motion in part. The court explained:

> "[I]n this court's opinion, the evidence does touch on the complainant's prior sexual history and/or reputation.
>
>       After having given this a lot of thought, probably much more thought than the parties ever thought the court would, I think that a balance can be struck in this situation, and that's what my ruling is going to be. The court is going to allow the

witness to testify that he had personal contact with the victim at the bar between two and 4:30 a.m. He may testify to his observations of her physical condition and his ability to converse with her and she with him. He can also testify that he received a series of text messages and had a phone conversation with her up until somewhere around 4:30 a.m. However, the court will bar the witness from disclosing any sexual suggestions or the actual content of the conversation as far as it goes to sexual suggestions, and I will not allow the content of the text messages themselves to be admitted because of their sexual content.

I think this strikes a balance between giving the defendant an opportunity to present evidence of the victim's alleged abilities while also protecting her reputation and her from being harassed based upon the content of some of those conversations. So, in essence, the motion is allowed in part and denied in part."

¶ 8   In April 2013, defendant filed a motion to reconsider the trial court's ruling on the State's motion *in limine*, which the court denied. The court found its ruling struck the proper balance because it allowed defendant to pursue the issue of whether B.J. had the cognitive ability to consent based upon her ability to communicate both electronically and in person with Lacomba, while protecting her from embarrassment and harassment. It noted, "the substance of those [text messages,] they're–if they're offered will serve only to demonstrate a level of promiscuity *** to suggest, even if not overtly, *** if she was promiscuous with one individual then she obviously must have been promiscuous with the defendant. And I think that's what the statute is meant to avoid."

¶ 9                                          B. *Voir Dire*
¶ 10   The jury venire in this case consisted of 32 potential jurors. The precise racial makeup of the venire is unknown. What is known is the State exercised its third and sixth peremptory challenges on African-American venire members. Following the State's sixth challenge, the following colloquy took place:

"[DEFENSE COUNSEL]: Judge, I would ask the court to note that two challenges have been made to the only two African Americans that we've reached at this point in time, that being [Juror 100 and Juror 14].

THE COURT: All right. The court will note that those two jurors indicated by counsel appear to be African American.

[THE STATE]: I'll just ask because we think we need to at this point in time, is there a *Batson* challenge?

THE COURT: I'm not sure what you're asking, [defense counsel].

[DEFENSE COUNSEL]: I first wanted the court to make that foundationary [*sic*] finding, and yes, I am making a *Batson* challenge.

THE COURT: As indicated, the court would agree that [Juror 100 and Juror 14] both appear to be African American in descent. The State has asked to excuse both of those jurors, along with several others. The court is required to make a finding that there is a pattern of excusing jurors based upon race before the court is to call upon the party challenged to offer some race neutral reason for why they've excused those jurors. It's always somewhat difficult to do when the numbers of those who are of an apparent minority are small. In this particular panel, I believe there are three

individuals of African American descent, although one we have not reached yet is later on down the road here. There have only been two thus far. I think it's almost virtually impossible to create a pattern with one, perhaps with two, certainly with three. I'm not convinced at this point that a pattern has been established. There are two jurors who have been excused, but there are certainly a lot of other jurors the State has excused, five other jurors, or four other jurors, rather, who are not of minority, so I don't–I'm not at the point yet where I think that there is a pattern of exclusion based upon race that is obvious or evident. So at this point I'm not going to require the State to provide a race neutral explanation. ***

    [DEFENSE COUNSEL]: Judge, I'm sorry, I'm not arguing with, just for record keeping purposes, the State dismissed [Juror 14], and who was the other one out of there?

    THE COURT: [Juror 100].

    [THE STATE]: [Juror 100].

    [DEFENSE COUNSEL]: She was in our last panel then.

    THE COURT: Correct.

    [DEFENSE COUNSEL]: Thank you."

¶ 11                          C. Trial and Posttrial Proceedings

¶ 12     In May 2013, defendant's case proceeded to jury trial. Although the sufficiency of the evidence is not at issue, we find the following brief summary of the evidence presented at trial helpful to a full understanding of the issues on appeal.

¶ 13     B.J. testified she knew defendant as the bartender at Fat Jacks in Bloomington, Illinois. On the night of the offense, B.J. went to Fat Jacks around 11:45 p.m., where defendant gave her free alcohol all night. B.J. had maybe 12 drinks–5 or 6 beers and several shots of Grey Goose vodka. When the bar closed at 2 a.m., she stayed and continued talking to defendant because she was upset. She asked defendant if he wanted to go back to her apartment to continue drinking, and they called a cab. Instead of going to B.J.'s apartment, the cab driver took them to defendant's apartment because defendant told B.J. he had to grab some things. When they arrived at defendant's apartment, they went inside and continued drinking. B.J. explained she had two more beers and was sitting on the couch drinking and sending text messages until she told defendant she needed to go to bed. Defendant took her downstairs to his bedroom and she took off all of her clothes except for a tank top and underwear. As soon as she lay down in defendant's bed, her head began spinning and she told defendant she was going to get sick. She ran upstairs to the bathroom, where she vomited and dry heaved. When she came out of the bathroom, defendant handed her some water and she went back to bed.

¶ 14     The next thing B.J. remembered was waking up to defendant having sex with her. She explained she did not understand what was happening to her, and she "just froze." At one point, she heard defendant spit and felt his fingers inside of her. She stated she kept her head under the covers and did not say a word during the entire incident. After defendant finished having sex with her, B.J.'s "brain told [her]" she just needed to wait until 7 a.m.–until defendant fell asleep–and then she could leave. However, she could not wait any longer, and woke defendant up to tell him she needed to get home to take care of her dog. Defendant called B.J. a cab, and B.J. sent a text message to her mother telling her to meet her at her apartment.

¶ 15     B.J.'s parents took her to the hospital, where she talked to the Bloomington police about the incident. Police officers then went to defendant's house, where they found defendant under a blanket in a utility room next to his bedroom. Defendant was taken into custody and interviewed regarding the incident. During the interview, defendant's version of events mirrored B.J.'s version, until the time of the alleged sexual assault. Defendant explained he and B.J. took a cab to his apartment, where they continued drinking. B.J. told him she wanted to go to bed and took off her clothes. B.J. had to throw up, so defendant showed her where the bathroom was. Defendant explained he could hear her vomiting and asked her if she needed any water. B.J. then went back to bed.

¶ 16     Defendant later joined her in bed and fell asleep, but B.J. woke him up when she started to rub his penis. Defendant stated he could not believe it was happening, but B.J. pulled him closer, grabbed his crotch, and they began having intercourse. He told the police officers B.J. did not say anything during the incident–"she just laid there"–but he could hear her moaning and her hips were gyrating. He admitted to the police officers B.J. had never flirted with him or given him any indication beforehand that she wanted to begin an intimate relationship. When asked whether he thought she was intoxicated, defendant replied, "On one level yeah. I mean, yeah," and when asked whether he would have let her drive home from the bar, he responded, "absolutely not."

¶ 17     Several witnesses testified regarding B.J.'s cognitive abilities near the time of the incident. Roger Coyne, the taxi driver who picked defendant and B.J. up from Fat Jacks, explained both defendant and B.J. appeared normal to him and stated they "weren't walking *** like they were drunk." Defendant's roommate, Nick Bargmann, testified B.J. appeared to be sober while she was at the apartment.

¶ 18     Pursuant to the trial court's ruling on the State's motion *in limine*, Lacomba testified he had been texting B.J. until after 4 a.m. and had talked to her on the phone for around 15 to 20 minutes. He stated, "Based on the conversation [they] had, the consistency of the conversation, and [B.J.'s] body language before leaving the bar," he did not believe B.J. was intoxicated. On cross-examination, the State asked Lacomba whether B.J.'s text messages made it clear she did not want to be at defendant's house. Lacomba responded, "I wouldn't say that was very clear." The State rephrased its question: "It was clear that she didn't want to stay at the Defendant's house. In fact, she asked you for a ride?" Lacomba responded, "Yes."

¶ 19     Following presentation of the evidence, the jury found defendant guilty on both counts of criminal sexual assault. In July 2013, the trial court sentenced defendant to consecutive eight-year terms of imprisonment on the criminal sexual assault convictions and a consecutive three-year term of imprisonment on the unlawful possession conviction. Later that month, defendant filed a motion to reconsider his sentence and a motion to withdraw his guilty plea on the unlawful possession charge. In August 2013, the court denied both motions.

¶ 20     This appeal followed.

¶ 21                                         II. ANALYSIS

¶ 22     On appeal, defendant argues the trial court (1) improperly denied his *Batson* challenge following the State's peremptory challenge of Juror 14, and (2) erred when it prohibited defense counsel from introducing testimony regarding the content of text messages B.J. sent to Lacomba on the night of the offense.

## A. The *Batson* Challenge

Defendant first argues the trial court erred in denying his *Batson* challenge because it never gave defense counsel an opportunity to establish a *prima facie* case of purposeful discrimination against African-American members of the venire. In the alternative, defendant argues (1) the trial court's ruling on his challenge was incorrect as a matter of law, and (2) the record supports a *prima facie* finding of purposeful racial discrimination. The State contends defendant forfeited the issue of whether the trial court erred by denying his *Batson* challenge because he failed to raise the issue in a posttrial motion.

Generally, to preserve a claim of error for appeal, a party must raise an objection both at trial *and* in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988). However, our supreme court has relaxed the forfeiture rules with regard to "constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction hearing petition." *Id.* at 190, 522 N.E.2d at 1131-32. Thus, because a *Batson* claim involves a constitutional issue and defendant properly objected at trial, we will address the merits of his appeal. See *People v. Mitchell*, 152 Ill. 2d 274, 285, 604 N.E.2d 877, 884 (1992).

### 1. *Batson Procedure*

In *Batson*, the United States Supreme Court established a three-step process for evaluating claims of alleged racial discrimination in the jury selection process. First, "the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race." *People v. Williams*, 209 Ill. 2d 227, 244, 807 N.E.2d 448, 459 (2004). During the second step, once the trial court determines defendant has established a *prima facie* case, the burden shifts to the State to provide a race-neutral explanation for excluding the potential jury members. *Id.* Defendant may then rebut the proffered reason as pretextual. *Id.* Finally, during the third step of the *Batson* hearing, the trial court must determine whether the defendant has met his burden of showing purposeful discrimination in light of the parties' submissions. *Id.*

The issues in this case involve the first step of the *Batson* process–*i.e.*, whether defendant established a *prima facie* case of purposeful discrimination. To establish a *prima facie* case under *Batson*, a defendant must demonstrate that relevant circumstances give rise to an inference of purposeful discrimination on behalf of the State. *People v. Davis*, 231 Ill. 2d 349, 360, 899 N.E.2d 238, 245 (2008). In determining whether a defendant has met this burden, the trial court "must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike to see if they give rise to a discriminatory purpose." *Id.* (quoting *Batson*, 476 U.S. at 94, 96-97). Relevant factors the court should consider include the following:

> "(1) racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory

challenges; (6) whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses." *People v. Williams*, 173 Ill. 2d 48, 71, 670 N.E.2d 638, 650 (1996).

See also *People v. Rivera*, 221 Ill. 2d 481, 501, 852 N.E.2d 771, 783-84 (2006). A trial court's ruling on the sufficiency of a *prima facie* case is a finding of fact that will not be disturbed unless it is against the manifest weight of the evidence. *Id.* at 502, 852 N.E.2d at 784.

¶ 29                                    2. *Defendant's Argument on Appeal*

¶ 30        Defendant first argues the trial court erred in denying his *Batson* challenge because it never gave defense counsel an opportunity to establish a *prima facie* case. We disagree.

¶ 31        After the State exercised its sixth peremptory challenge against Juror 14, defense counsel asked the trial court to note "two challenges ha[d] been made to the only two African Americans" the court had reached at that point in time. When prompted by the State, the court asked defense counsel whether he was making a *Batson* challenge. Defense counsel responded, his statements were a "foundationary [*sic*] finding" for the record, and "yes, [he was] making a *Batson* challenge." The court then concluded defendant's proffered evidence was insufficient to establish a *prima facie* case of purposeful discrimination, finding no need to elicit a race-neutral explanation from the State.

¶ 32        Nothing about this exchange leads us to believe defendant was not given an opportunity to establish a *prima facie* case of purposeful discrimination. The trial court asked defense counsel to clarify his statements regarding the challenged African-American jurors and defense counsel responded by stating he was making a "foundationary [*sic*] finding" to support his *Batson* challenge. Defendant was not interrupted or prevented from making any additional arguments. Moreover, at no point did defense counsel interject or request the court to consider anything other than his initial assertion the State had peremptorily challenged both African-American venire members. Rather, following the trial court's pronouncement, defense counsel thanked the court, and jury selection continued. We find defendant was given a full opportunity to establish a *prima facie* case, and the record contains the extent of the evidence defense counsel sought to offer.

¶ 33        We note, in making this initial argument, defendant impliedly admits the evidence he set forth at trial was insufficient to establish a *prima facie* case of purposeful discrimination. He claims, had he been given the opportunity, he *could have* set forth evidence sufficient for the trial court to draw an inference of purposeful discrimination. He then attempts to establish a *prima facie* case on appeal by addressing the seven factors laid out in both *Williams* and *Rivera* and argues the record produced evidence sufficient to permit the trial court to draw an inference of discrimination in the State's use of peremptory strikes. We remind defendant, *he* had the burden of establishing a *prima facie* case of purposeful discrimination before the trial court–not on appeal. See *id.* at 512, 852 N.E.2d at 789.

¶ 34        Defendant relies on this court's decision *People v. Shaw*, 2014 IL App (4th) 121157, 21 N.E.3d 802, and argues the trial court has the burden of guiding the parties through the *Batson* process and asking questions based upon the seven relevant factors to determine whether defendant has set out a *prima facie* case. We disagree with defendant's interpretation of our decision in *Shaw*.

¶ 35    In *Shaw*, defense counsel raised a *Batson* challenge after the State excused the first African-American venire member. *Id.* ¶ 8. In support of his challenge, counsel alleged the challenged juror was the only African-American in the panel thus far, and there were " 'no facts or other relevant circumstances that would raise an inference that [the challenge] was anything other than for race.' " *Id.* Before the trial court could respond, however, the State argued defense counsel was not following correct procedure; counsel had to establish a pattern with regard to challenges based on race. *Id.* The court then ruled on the challenge, stating only, " 'Defendant has not established a pattern under *Batson*.' " *Id.*

¶ 36    On appeal, we held it was "unclear whether the trial court found defendant established a *prima facie* case of discrimination" because the court did not follow the well-established three-step procedure for addressing *Batson* claims. *Id.* ¶ 26. We specifically ruled, "[The three-step] procedure was not followed here and, as a result, the record is insufficient for us to conduct a meaningful review of defendant's *Batson* challenges." *Id.* ¶ 30. In so holding, we noted a pattern is only one of several factors a trial court should consider in determining whether a defendant has established a *prima facie* case of purposeful discrimination. *Id.* ¶ 26. Our point in *Shaw* was simply to emphasize the importance of the three-step process and to remind the trial court to consider all relevant factors–not to transfer the burden of establishing a *prima facie* case from the defendant to the trial court. The three-step process was properly followed in the present case, and thus, we must determine whether the trial court erred in finding defendant's evidence insufficient to support a *prima facie* finding. We conclude it did not.

¶ 37    Although the threshold for making out a *prima facie* case is not high, a defendant must still produce evidence "sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). The "mere number of [minority] venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination." *Davis*, 231 Ill. 2d at 361, 899 N.E.2d at 245; see also *Rivera*, 221 Ill. 2d at 512, 852 N.E.2d at 789-90 ("The number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the *voir dire* answers of those who were struck compared to the answers of those who were not struck.").

¶ 38    Defense counsel's *Batson* objection below relied solely on the fact the State used peremptory challenges to exclude the first two African-American venire members–*i.e.*, there was a pattern of strikes against African-Americans. In responding to defendant's allegations, the court noted the difficulty of establishing a pattern with so few minority venire members and noted the State had exercised four other peremptory challenges against nonminority venire members. Based on the evidence before it, the court found no reason to require the State to provide a race-neutral explanation.

¶ 39    On appeal, defendant does not argue his proffered evidence was sufficient to establish a *prima facie* case; he argues the trial court's ruling was incorrect as a matter of law. He quotes a portion of the court's ruling, which states, "I think it's almost virtually impossible to create a pattern with one, perhaps two, certainly with three." He contends this statement directly contradicts the United States Supreme Court rule stating the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." (Internal quotation marks omitted.) *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Defendant's reliance on this rule is misplaced because, as mentioned earlier, the existence of a pattern is only one of many factors

a defendant has in his arsenal to support a claim of purposeful discrimination in the selection of a jury.

¶ 40 Where evidence of a pattern is an irrelevant factor, such as when there has only been one African-American challenged, a defendant must set forth other evidence which gives rise to an inference of discrimination. See *People v. Davis*, 345 Ill. App. 3d 901, 910, 803 N.E.2d 514, 522 (2004) (holding a "pattern of strikes" is an irrelevant factor in determining whether the defendant established a *prima facie* case of discrimination under *Batson* where there is only one African-American in the venire). Moreover, "requiring a trial court to find a defendant has established a *prima facie* case based solely upon the fact that the State has peremptorily excused all of the black jurors from the venire *** would effectively negate consideration of all the other relevant circumstances *** and would be inconsistent with *Batson*." *People v. Jones*, 177 Ill. App. 3d 663, 668-69, 532 N.E.2d 543, 546 (1988).

¶ 41 In this case the existence of a pattern of discrimination was the extent of defendant's argument in support of his *Batson* claim. Looking to the totality of the circumstances surrounding the State's challenges, the trial court found no pattern had been established. Yet, defendant would have us conclude the court erred because it did not *sua sponte* address other factors, which he claims were potentially in his favor. We decline to do so. As stated above, the trial court is not tasked with establishing defendant's *prima facie* case for him. Further, as the party making the *Batson* objection, defendant was responsible for preserving the record, and any ambiguities must be construed against him. *Rivera*, 221 Ill. 2d at 512, 852 N.E.2d at 789. From the record, we know (1) defendant is Caucasian, (2) the court "believed" there were only three African-Americans in the venire pool, (3) the State exercised four peremptory strikes against Caucasians, and (4) Juror 100 shared several characteristics with other excluded venire members and Juror 14 had not spoken at all. Thus, we are left only to speculate as to (1) the actual racial makeup of the venire, (2) the race of the complaining witness, and (3) whether any African-American venire members served on the jury. Given the substance of defendant's *Batson* challenge and the content of the record on appeal, we conclude the trial court's ruling was not against the manifest weight of the evidence.

¶ 42 B. The Rape-Shield Statute

¶ 43 Defendant next argues the trial court erred when it prohibited defense counsel from introducing the content of various text messages between B.J. and Lacomba on the night of the offense. He specifically argues (1) the communications were not covered by the rape-shield statute and (2) even if the communications were covered by the rape-shield statute, their admission was "constitutionally required" to show B.J.'s state of mind and ability to consent to sexual relations with defendant.

¶ 44 Nevertheless, because we conclude the content of the text messages should have been excluded as irrelevant, we need not determine whether sexually based text messages, in the proper case, are considered "prior sexual activity" or "reputation" pursuant to the rape-shield statute. See *People v. Schuldt*, 217 Ill. App. 3d 534, 541, 577 N.E.2d 870, 876 (1991) (holding evidence not properly barred by the rape-shield statute "remain[s] subject to standards of relevancy"); see also *Bell v. Louisville & Nashville R.R. Co.*, 106 Ill. 2d 135, 148, 478 N.E.2d 384, 389 (1985) (holding a reviewing court "can sustain the decision of the circuit court on any grounds which are called for by the record regardless of whether the circuit court relied on the grounds and regardless of whether the circuit court's reasoning was correct").

¶ 45 The State charged defendant with criminal sexual assault pursuant to section 11-1.20(a)(2) of the Criminal Code of 1961 (720 ILCS 5/11-1.20(a)(2) (West 2010)), which states, in relevant part, "A person commits criminal sexual assault if [he] commits an act of sexual penetration and *** knows that the victim *** is unable to give knowing consent." Defendant argues the content of the text messages was relevant because it goes directly to B.J.'s state of mind, ability to consent, and, "more important," a third person's (Lacomba's) perception of her ability to consent. Because nothing in the record indicates defendant had any knowledge of what B.J. was saying to Lacomba, we fail to see how the content of B.J.'s text messages to Lacomba adds anything of value to the fact-finding enterprise. To sustain defendant's conviction, the State was required to prove *defendant* knew B.J. was unable to give knowing consent–not Lacomba. 720 ILCS 5/11-1.20(a)(2) (West 2010).

¶ 46 Even if we were to look solely at whether the evidence had a tendency to show B.J. had the ability to consent–irrespective of what defendant *knew*–the trial court's ruling on the State's motion *in limine* allowed Lacomba to testify regarding B.J.'s cognitive abilities during their conversation. At trial, Lacomba explained he had conversed with B.J. between the hours of 2:30 a.m. and 4:30 a.m. and believed she was not intoxicated. He further testified the text messages they exchanged were understandable and legible, and B.J. did not appear to have any difficulty communicating during their 15- to 20-minute phone call.

¶ 47 We recognize a portion of defendant's argument relates to his ability to cross-examine B.J. pursuant to the confrontation clause of the sixth amendment. See U.S. Const., amend. VI. However, not even the confrontation clause requires the admission of evidence which poses an undue risk of harassment, prejudice, or confusion of the issues. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Rather, "[t]he true question is always one of relevancy." *People v. Hill*, 289 Ill. App. 3d 859, 864, 683 N.E.2d 188, 191 (1997). As our sister court explained in *People v. Cornes*, 80 Ill. App. 3d 166, 175, 399 N.E.2d 1346, 1352 (1980), "Defendant's right of confrontation necessarily includes the right to cross-examine witnesses, but that right does not extend to matters which are irrelevant and have little or no probative value. Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant." Accordingly, we disagree that disclosure of the content of the text messages was required to show B.J.'s "state of mind." Even if consent were at issue, B.J.'s willingness to engage in sexual conduct with Lacomba has absolutely no bearing on her willingness to engage in sexual conduct with defendant.

¶ 48 Last, defendant argues the court's order allowed the State to mislead the jury into believing B.J. was desperate to get away from defendant when, in reality, she wanted to have consensual sexual relations with Lacomba. However, when the State asked Lacomba whether it was clear B.J. wanted to "get away from" defendant, Lacomba stated, "I wouldn't say it was clear." The only thing Lacomba positively testified to was that B.J. had asked him for a ride. Again, we fail to see how B.J. wanting a ride from Lacomba has anything to do with whether she had the ability to consent to sexual relations with defendant or whether defendant had knowledge of that fact.

¶ 49 Defendant was given considerable latitude regarding the text messages exchanged between B.J. and Lacomba. Revealing the sexual nature of those text messages would have added no relevant information and would have served only to harass and embarrass B.J. on a collateral matter. We find no error in the trial court's exclusion of the content of the communications.

¶ 50                          III. CONCLUSION

¶ 51            We affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2012).

¶ 52            Affirmed.