NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180349-U

NO. 4-18-0349

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 19, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DERRY JAY SANDERS, | ) | No. 12CF23 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding defendant's amended postconviction petition failed to make a substantial showing of a constitutional violation.

¶ 2    Defendant, Derry Jay Sanders, appeals from the trial court's judgment dismissing his amended postconviction petition. On appeal, defendant argues this court should reverse and remand for an evidentiary hearing because his petition makes a substantial showing of a constitutional violation. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Indictment

¶ 5    In January 2012, a grand jury indicted defendant on two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2010)) and one count of unlawful possession of a

controlled substance (720 ILCS 570/402(c) (West 2010)). Defendant later entered an open plea of guilty to the unlawful possession charge.

¶ 6                                          B. Jury Trial

¶ 7          In May 2013, defendant's case proceeded to a jury trial on the two criminal sexual assault charges.

¶ 8          During opening statements, defendant's trial counsel asserted the evidence would show defendant thought the complaining witness, B.J., was able to and did consent to the sexual activity that occurred between them.

¶ 9          B.J. testified she knew defendant as the bartender at Fat Jacks in Bloomington, Illinois. In January 2012, B.J. went to Fat Jacks around 11:45 p.m., where defendant gave her free alcohol all night. B.J. had maybe 12 drinks—five or six beers and several shots of Grey Goose vodka. When the bar closed at 2 a.m., she stayed and continued talking to defendant because she was upset. She asked defendant if he wanted to go back to her apartment to continue drinking, and they called a cab. Instead of going to B.J.'s apartment, the cab driver took them to defendant's apartment because defendant told B.J. he had to grab some things. When they arrived at defendant's apartment, they went inside and continued drinking. B.J. explained she had two more beers and was sitting on the couch drinking and sending text messages until she told defendant she needed to go to bed. Defendant took her downstairs to his bedroom, and she took off all her clothes except for a tank top and underwear. As soon as she lay down in defendant's bed, her head began spinning, and she told defendant she was going to get sick. She ran upstairs to the bathroom, where she vomited and dry heaved. When she came out of the bathroom, defendant handed her some

water, and she went back to bed.

¶ 10          The next thing B.J. remembered was waking up to defendant having sex with her. She explained she did not understand what was happening to her and she "just froze." At one point, she heard defendant spit and felt his fingers inside of her. She kept her head under the covers and did not say a word during the entire incident. After defendant finished having sex with her, B.J.'s "brain told [her]" she just needed to wait until 7 a.m.—until defendant fell asleep—and then she could leave. However, she could not wait any longer, and woke defendant up to tell him she needed to get home to take care of her dog. Defendant called B.J. a cab, and B.J. sent a text message to her mother telling her to meet her at her apartment.

¶ 11          B.J.'s parents took her to the hospital, where she talked to the Bloomington police about the incident. Police officers then went to defendant's house, where they found defendant under a blanket in a utility room next to his bedroom. Defendant was taken into custody and transported to the Bloomington Police Department, where he was interviewed regarding the incident. The interview was recorded. An audio and video recording which contained portions of the interview was admitted into evidence and played for the jury. During the interview, defendant's version of events mirrored B.J.'s version, until the time of the alleged sexual assault. Defendant explained he and B.J. took a cab to his apartment, where they continued drinking. B.J. told him she wanted to go to bed and took off her clothes. B.J. had to throw up, so defendant showed her where the bathroom was. Defendant explained he could hear her vomiting and asked her if she needed any water. B.J. then went back to bed.

¶ 12          According to defendant, he later joined B.J. in bed and fell asleep, but B.J. woke

him up when she started to rub his penis. Defendant stated he could not believe it was happening, but B.J. pulled him closer, grabbed his crotch, and they began having intercourse. He told the police officers B.J. did not say anything during the incident—"she just laid there"—but he could hear her moaning and her hips were gyrating. He admitted to the police officers B.J. had never flirted with him or given him any indication beforehand that she wanted to begin an intimate relationship. When asked whether he thought she was intoxicated, defendant replied, "On one level yeah. I mean, yeah," and when asked whether he would have let her drive home from the bar, he responded, "absolutely not." Near the end of the interview, defendant was questioned about the way B.J. was allegedly rubbing his penis. The detective asserted defendant's description was physically impossible given the way B.J. was laying. Defendant insisted he was telling the truth. After the detective left the room, defendant got down on the floor and attempted to recreate the way B.J. was allegedly rubbing his penis.

¶ 13 Several witnesses testified regarding B.J.'s cognitive abilities near the time of the incident. Roger Coyne, the taxi driver who picked defendant and B.J. up from Fat Jacks, explained both defendant and B.J. appeared normal to him and stated they "weren't walking *** like they were drunk." Defendant's roommate, Nick Bargmann, testified B.J. appeared to be sober while she was at the apartment. A bouncer at Fat Jacks, Nick Lacomba, testified he had been texting B.J. until after 4 a.m. and had talked to her on the phone for around 15 to 20 minutes. He stated, "Based on the conversation [they] had, the consistency of the conversation, and [B.J.'s] body language before leaving the bar," he did not believe B.J. was intoxicated. On cross-examination, the State asked Lacomba whether B.J.'s text messages made it clear she did not want to be at defendant's

house. Lacomba responded, "I wouldn't say that was very clear." The State rephrased its question: "It was clear that she didn't want to stay at the Defendant's house. In fact, she asked you for a ride?" Lacomba responded, "Yes."

¶ 14        During closing arguments, defendant's trial counsel advanced the theory, using defendant's recorded interview, defendant thought B.J. was able to and did consent to the sexual activity that occurred between them.

¶ 15        Following its deliberations, the jury found defendant guilty of both counts of criminal sexual assault.

¶ 16                                C. Posttrial Proceedings

¶ 17        In July 2013, the trial court sentenced defendant to consecutive eight-year terms of imprisonment on the criminal sexual assault convictions and a consecutive three-year term of imprisonment on the unlawful possession conviction. Later that month, defendant filed a motion to reconsider his sentence and a motion to withdraw his guilty plea on the unlawful possession charge. In August 2013, the court denied both motions. Defendant appealed.

¶ 18                                D. Direct Appeal

¶ 19        On appeal, defendant argued the trial court (1) improperly denied his *Batson* challenge (*Batson v. Kentucky*, 476 U.S. 79, 89 (1986)) and (2) erred when it prohibited trial counsel from introducing the content of text messages B.J. sent another man the night of the offense. *People v. Sanders*, 2015 IL App (4th) 130881, ¶ 1, 34 N.E.3d 219. After our review, we rejected defendant's arguments and affirmed. *Id.* ¶¶ 41, 49, 51.

¶ 20                        E. *Pro Se* Postconviction Petition

¶ 21    In April 2017, defendant filed a *pro se* postconviction petition. The petition was later advanced to the second stage of postconviction proceedings.

¶ 22    F. Amended Postconviction Petition

¶ 23    In January 2018, defendant, through appointed postconviction counsel, filed an amended postconviction petition. In his petition, defendant alleged a claim of ineffective assistance of trial counsel based on trial counsel's failure to file a motion to suppress the statements he made to the police. Defendant asserted the motion to suppress would have been granted as his statements followed his unambiguous request for a lawyer, which the police ignored, and there was a reasonable probability the outcome of the trial would have been different had his statements been suppressed. Defendant further alleged a claim of ineffective assistance of appellate counsel based on appellate counsel's failure to raise a claim concerning trial counsel's ineffectiveness.

¶ 24    G. Motion to Dismiss

¶ 25    In March 2018, the State filed a motion to dismiss defendant's amended postconviction petition. The State asserted defendant's petition failed to make a substantial showing of a constitutional violation. The State contended (1) a motion to suppress would not have been granted as defendant never made an unequivocal request for a lawyer and (2) the outcome of the trial would not have been different even if the statements had been suppressed.

¶ 26    H. Dismissal

¶ 27    In May 2018, the trial court held a hearing on the State's motion to dismiss defendant's amended postconviction petition. The court entertained oral arguments and, by agreement of the parties, received transcripts of defendant's recorded interview for it to consider

in evaluating the arguments presented.

¶ 28    The following is gleaned from the transcripts of defendant's recorded interview. After defendant was brought to the Bloomington Police Department and placed inside an interview room, Detective Michael Burns entered the room and asked for defendant's consent to search his apartment. Defendant consented. Detective Burns then read and asked defendant to sign a consent form. Defendant signed the form. Detective Burns stated he was going to go to defendant's apartment and then left the room.

¶ 29    Approximately two hours later, Detective Burns returned to the interview room and asked for defendant's consent to search his cell phone. Defendant consented. Detective Burns then began reading defendant a consent form. While doing so, the following exchange took place:

"[DETECTIVE BURNS]: And is there any password to get on that?

[DEFENDANT]: Yes, there is.

[DETECTIVE BURNS]: What is it?

[DEFENDANT]: Let me—can I draw it for you?

[DETECTIVE BURNS]: Yeah.

[DEFENDANT]: 'Cause it's gonna be circles. The second question is am I gonna need a lawyer? Or when can I ask for a lawyer?

[DETECTIVE BURNS]: Well, yeah, you can ask for a lawyer and we can go over that. Go over that, okay?

[DEFENDANT]: Okay. This is the password. 'Cause I'm totally scared here.

[DETECTIVE BURNS]: Okay. That's fine.

[DEFENDANT]: And I want my legal rights.

[DETECTIVE BURNS]: Right. Right. Absolutely."

After the exchange, Detective Burns finished reading defendant the consent form and asked him to sign it. Defendant signed the form. Detective Burns then told defendant he was waiting for police officers who were searching defendant's apartment. Defendant responded, "Okay. I'm just—wanna have my rights covered." Detective Burns responded, "Right. Absolutely." He then left the room.

¶ 30 Approximately 30 minutes later, Detective Burns returned to the interview room. At that point, Detective Burns explained to defendant that he was in custody and he had to read him his rights. Detective Burns asked if defendant had seen those rights before, to which defendant indicated he had. The following exchange then occurred:

"[DETECTIVE BURNS]: Good. Uh. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned, if you can't afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. And you can decide at any time to exercise these rights and not answer any questions or make any statements.

What that last one means, sir, is that if you decide to start talking to me, that does mean at any time you can decide I'm done talkin', okay?

[DEFENDANT]: Mm hmm.

[DETECTIVE BURNS]: Do you understand those rights?

[DEFENDANT]: I do.

[DETECTIVE BURNS]: Okay. Having those rights in mind, is it okay to talk about what happened?

[DEFENDANT]: Sure. Sure. I just want to be—I don't want to self-incriminate myself. That's my only thing.

[DETECTIVE BURNS]: Okay.

[DEFENDANT]: But I feel I, I am on the right side here.

[DETECTIVE BURNS]: Okay. And that's—like I said sir, that's why I wanted them to bring you down here. Okay?

[DEFENDANT]: Sure.

[DETECTIVE BURNS]: 'Cause when we do investigations, we want to get everybody's side.

[DEFENDANT]: Absolutely.

Defendant proceeded to tell Detective Burns, and then later Detective Richard Barkes, the details of the sexual encounter between B.J. and himself.

¶ 31    At one point while defendant was providing his account to Detective Barkes,

Detective Barkes inquired about cocaine discovered in defendant's bedroom. After defendant explained he found the cocaine at the bar and noted, "we work with the vice cops," Detective Barkes stated, "You know what? I don't care." Defendant responded, "Okay. Then I want a lawyer." At that point, Detective Barkes ended the interview.

¶ 32    After considering the transcripts from defendant's interview and the oral and written arguments presented, the trial court dismissed defendant's amended postconviction petition, concluding it failed to make a substantial showing of a constitutional violation. The court reached that conclusion based on its determination defendant did not unequivocally invoke his right to counsel and, therefore, a motion to suppress his statements would not have been granted.

¶ 33    This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35    On appeal, defendant argues this court should reverse the trial court's judgment dismissing his amended postconviction petition and remand for an evidentiary hearing because his amended postconviction petition makes a substantial showing of a constitutional violation. The State disagrees.

¶ 36    Defendant's amended postconviction petition was dismissed at the second stage of postconviction proceedings. At the second stage, the relevant inquiry is "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Johnson*, 2018 IL 122227, ¶ 15, 123 N.E.3d 1083. The defendant bears the burden of making such a showing. *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. A trial court's second-stage dismissal is reviewed *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29, 124

N.E.3d 908.

¶ 37    In his amended postconviction petition, defendant alleges claims of ineffective assistance of trial and appellate counsel. "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance of counsel are analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Id.* To prevail on a claim of ineffective assistance, a defendant must show: (1) "counsel's performance was objectively unreasonable under prevailing professional norms" and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). A defendant's failure to satisfy either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel. *Id.*

¶ 38    Defendant's claims of ineffective assistance of counsel are based on the failure to file a motion to suppress his statements to the police. "In order to establish prejudice resulting from failure to file a motion to suppress, a defendant must show a reasonable probability that *** the motion would have been granted ***." *People v. Patterson*, 217 Ill. 2d 407, 438, 841 N.E.2d 889, 907 (2005).

¶ 39    Defendant asserts a motion to suppress his statements would have been granted as his statements followed his invocation of his right to counsel which the police ignored. See *Miranda v. Arizona*, 384 U.S. 436, 469-473 (1966) (holding a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during

questioning); *People v. Villalobos*, 193 Ill. 2d 229, 241-42, 737 N.E.2d 639, 646 (2000) ("In order to invoke the *Miranda* right to counsel, an individual must be both in custody and subject to interrogation or under imminent threat of interrogation.").

¶ 40    The determination of whether a suspect invoked his right to counsel is an objective one. *In re Christopher K.*, 217 Ill. 2d 348, 380, 841 N.E.2d 945, 964 (2005). To invoke the right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer need not cease its questioning of the suspect. (Emphasis in original.) *Id.*; see also *People v. Oaks*, 169 Ill. 2d 409, 451-53, 662 N.E.2d 1328, 1347 (1996), *rev'd on other grounds*, *In re G.O.*, 191 Ill. 2d 37, 45-50, 727 N.E.2d 1003, 1008-1010 (2000) (applying *Davis* and holding, absent an unambiguous or unequivocal request for counsel, the investigators in that case had no obligation to stop questioning the defendant).

¶ 41    Defendant contends he invoked his right to counsel when he asked Detective Burns when he could ask for a lawyer and told him he wanted his legal rights. The State disagrees. Defendant posed the question of when he could ask for a lawyer when Detective Burns was in the process of obtaining defendant's consent to search his cell phone and before defendant was read his *Miranda* rights and questioned about the circumstances of the alleged offenses. Detective Burns correctly responded defendant could ask for a lawyer and they could "go over that."

Defendant confirmed he understood and then showed Detective Burns the password for his cell phone. Defendant then commented he wanted his "legal rights," to which Detective Burns responded, "Right. Right. Absolutely." Under the circumstances presented, we find defendant's question about a lawyer and comment that he wanted his legal rights did not constitute a clear invocation of his right to counsel that would have required Detective Burns to stop questioning defendant until a lawyer was present. To the contrary, we find a reasonable officer would have understood defendant's question to be an inquiry as to the timing of when he could ask for a lawyer and defendant's comment to be a request to be informed of his *Miranda* rights.

¶ 42        Defendant's attempt to analogize his question and comment with the queries of the defendants in *People v. Harris*, 2012 IL App (1st) 100678, 977 N.E.2d 811, and *People v. Schuning*, 399 Ill. App. 3d 1073, 928 N.E.2d 128 (2010), queries which were found to constitute unequivocal invocations of the right to counsel, is unconvincing. In *Harris*, 2012 IL App (1st) 100678, ¶¶ 17, 72, the defendant, after being advised of her *Miranda* rights, asked whether it was "possible" to "have a few days to get an attorney." In *Schuning*, 399 Ill. App. 3d at 1086, the defendant, who was being treated in a hospital's intensive care unit under constant police guard and who had already been interviewed and advised of his *Miranda* rights, asked whether he could call his attorney prior to his second interview. The queries in *Harris* and *Schuning* are, in context, a much clearer indication of the defendants' desire to have an attorney present than the question and comment posed by defendant in this case.

¶ 43        Because defendant did not unequivocally invoke his right to counsel, there is no reasonable probability a motion to suppress the statements would have been granted and, therefore,

defendant's claims of ineffective assistance fail. Accordingly, defendant's amended postconviction petition fails to make a substantial showing of a constitutional violation, and dismissal was appropriate.

¶ 44                                  III. CONCLUSION

¶ 45          We affirm the trial court's judgment.

¶ 46          Affirmed.